IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Jaimie Bittle Thorpe, )<br><br>Plaintiff, )<br><br>vs. )<br><br>Carolyn W. Colvin, Acting )<br>Commissioner of Social Security, )<br><br>Defendant. ) | Civil Action No. 6:14-3915-TMC-KFM<br><br>**REPORT OF MAGISTRATE JUDGE** |

This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).

The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. 405(g)) to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for disability insurance benefits under Title II of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff filed an application for disability insurance benefits ("DIB") on October 24, 2010, alleging that she became unable to work on September 8, 2006. The application was denied initially and on reconsideration by the Social Security Administration. On July 28, 2011, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff and Ruth B. Rondberg, an impartial vocational expert, appeared on February 26, 2013, considered the case *de novo* and, on March 14, 2013, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The ALJ's finding became the final decision of the Commissioner of Social Security when the

Appeals Council denied the plaintiff's request for review on June 13, 2014 (Tr. 8-11). The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

(1) The claimant last met the insured status requirements of the Social Security Act on March 31, 2012.

(2) The claimant did not engage in substantial gainful activity during the period from her alleged onset date of September 8, 2006, through her date last insured of March 31, 2012 (20 C.F.R. § 404.1571 *et seq*).

(3) Through the date last insured, the claimant had the following severe impairments: scoliosis and degenerative disc disease (20 C.F.R. § 404.1520(c)).

(4) Through the date last insured, the claimant did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).

(5) After careful consideration of the entire record, I find that through the date last insured, the claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R §§ 404.1567(a) except she requires an alternating at-will sit/stand option. She cannot do any overhead reaching or squatting. She cannot work with hazardous machinery. Due to pain and the side effects of medication, she will be off task 15% of the workday.

(6) Through the date last insured, the claimant was unable to perform any past relevant work (20 C.F.R. § 404.1565).

(7) The claimant was born on April 29, 1977, and was 34 years old, which is defined as a younger individual age 18-44, on the date last insured (20 C.F.R. § 404.1563).

(8) The claimant has at least a high school education and is able to communicate in English (20 C.F.R. § 404.1564).

(9) Transferability of job skills is not material to the determination of disability because the Medical-Vocational Rules support a finding that the claimant is "not disabled,"

whether or not claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

(10) Through the date last insured, considering claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that claimant could have performed (20 C.F.R. § 404.1569 and 404.1569(a)).

(11)    The claimant has not been under a disability, as defined in the Social Security Act, from September 8, 2006, the alleged onset date through March 31, 2012, the date last insured (20 C.F.R. § 404.1520(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2)  has a severe impairment, (3)  has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4)  has an impairment that prevents past relevant work, and (5)  has an impairment that prevents him from doing

3

substantial gainful employment. 20 C.F.R. § 404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* § 404.1520(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy that the plaintiff can perform despite the existence of impairments that prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. See *Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

4

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## **EVIDENCE PRESENTED**

The relevant period at issue in this case is between September 8, 2006, the plaintiff's alleged onset date of disability, at which time she was 29 years old, and March 31, 2012, her date last insured[1], at which time she was 34 years old.[2] She has a high school equivalent education and obtained an Associate's degree in veterinary technology (Tr. 32). She has past relevant work as a veterinary technician (Tr. 22).

The first treatment note of record is dated March 13, 2009, when the plaintiff presented to Anthony Wheeler, M.D., her pain management specialist, for evaluation after a long absence. Dr. Wheeler noted that the plaintiff was 34 weeks pregnant and had been receiving pain management through a rehabilitation center at the direction of her workers' compensation insurance carrier since he last evaluated her in June 2008. Dr. Wheeler noted that the plaintiff had slowly decreased her medication intake throughout her pregnancy but remained on minimum doses of methadone, oxycodone, Lyrical and Flexeril. She complained of bilateral lumbar pain radiating around into her groin area, left greater

---

[1]To qualify for DIB, a claimant must be found to be disabled on or before her last date insured. *See* 20 C.F.R. § 404.131; *see also* 42 U.S.C. § 423.

[2]In her brief, the plaintiff agrees that she last met the insured status requirements for DIB on March 31, 2012, but states that "she continued to be eligible for [Supplemental Security Income ("SSI")] (pl. brief at 5). However, the ALJ did not address any claim for SSI in the decision at issue here. The plaintiff cites an October 24, 2010, application, stating that it was for DIB and SSI (*id.*). However, the record shows that the application cited by the plaintiff was for DIB and, in the application, the plaintiff specifically stated, "I do not want to file for SSI" (Tr. 117).

than right, and bilateral iliotibial band pain and mid thoracic pain radiating into her anterolateral area. The plaintiff's obstetrician requested information regarding whether her pain would respond better to a planned cesarean section or a natural delivery. No abnormal findings were noted on examination. Dr. Wheeler indicated that a planned cesarean would be better based on the plaintiff's chronic pain and current use of opioids. He noted that labor might significantly impact her low back pain and her baby's health because of her methadone dependence. Dr. Wheeler prescribed methadone, Percocet, Lyrica, and Flexeril (Tr. 240-41).[3]

On November 6, 2009, the plaintiff visited T. Kern Carlton, M.D., at The Rehab Center (Tr. 227). She described that she had been "doing well" and had settled her [worker's compensation] case. On examination, she had back tenderness but no other abnormalities (*id*.). The plaintiff rated her pain at a six out of ten and asked about changing some of her medications to generic to reduce costs. Dr. Carlton's diagnoses were history of chronic low back pain since 2004; thoracolumbar contusion, September 8, 2006; mild thoracolumbar scoliosis and T7-8 right herniated disc and TS-6 and T6-7 disc protrusions; L4-5 disc protrusion and facet arthrosis by MRI; histories of malignant melanoma, aspiration pneumonia, endometriosis, and asthma; and depression. Dr. Carlton also noted that the plaintiff had a 40-pound weight gain since her injury. Dr. Carlton "encouraged [the plaintiff] to continue with her exercise program" and refilled her medication. Dr. Carlton also

---

[3] The plaintiff did not provide medical records prior to March 2009. *See* 42 U.S.C. § 423(d)(5)(A)("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require."); 20 C.F.R. §§ 404.1512(a), 404.1516 (generally setting forth a claimant's burden to produce evidence of a disabling impairment and the Agency's right to deny a claim for lack of evidence). However, the record contains a copy of the plaintiff's workers' compensation settlement agreement, which appears to summarize some of her medical treatment prior to 2009 (Tr. 120-41). According to that agreement, the plaintiff injured her back on September 8, 2006, when she stood up quickly from taking blood from a dog and struck her back on an open cage door above her (Tr. 120).

instructed the plaintiff to taper off of Lyrica and switch to gabapentin, and he discussed a future switch from Cymbalta to citalopram (*id.*).

At her January 8, 2010, appointment with Dr. Carlton, the plaintiff stated that "she has been managing well" and exercised "on a regular basis," despite rating her pain as a seven (Tr. 226). The plaintiff also reported that her medication helped and worked well. Her examination again showed tenderness but no other abnormalities (*id.*). At her appointment with Dr. Carlton on March 4, 2010, the plaintiff again stated, "medicine continues to be helpful," and her examination remained unchanged (Tr. 225).

The plaintiff returned to Dr. Wheeler on April 15, 2010, after a one-year absence because she was being treated by a workers' compensation doctor (Tr. 238, 300). The plaintiff described her exercise regime, which included 40 minutes of cardiovascular exercise and ten-to-fifteen minutes of upper body strength training. She reported pain in her thoracic and lumbar spine, but denied unusual weakness or fatigue (*id.*). Dr. Wheeler indicated that the plaintiff's left leg radicular symptoms extended in an S1 pattern and were aggravated by spinal loading and her right leg symptoms extended down to her knee. The plaintiff rated her pain at six out of ten. Dr. Wheeler reviewed the plaintiff's records from Dr. Carlton and noted that they showed medication compliance. He noted that the plaintiff was interested in other treatment options in an effort to decrease the amount of opioids she used. Dr. Wheeler indicated that the plaintiff's cervical range of motion was adequate and her thoracic scoliosis was less evident with improved posture. The plaintiff had moderate soft tissue dysfunction throughout her mid to lower thoracic region and her thoracolumbar region, predominantly left-sided. The plaintiff's soft tissue findings extended into her bilateral lumbosacral region, gluteal area, and bilateral iliotibial bands. There was tenderness over both greater hips trochanters consistent with bursitis. The plaintiff's lumbar flexion was adequate. Her ankle reflexes were 1+/4 on the right and trace on the left. Straight leg raising was negative. Dr. Wheeler's diagnoses were history of left pelvic

7

endometriosis successfully treated, but with residual myofascial dysfunction, which developed into lumbar discogenic syndrome with sciatica and subsequent involvement of the gluteus medius and minimus muscles, involvement of iliotibial band, and development of greater trochanteric bursitis; chronic persistent daily fatigue; frontal tension-type headaches; bilateral mechanical lumbar syndrome with recent right-sided involvement secondary to work-related injury; and bilateral mid to lower thoracic muscular spasm and soft tissue dysfunction with dysesthesia and tenderness extending into the anterolateral right more than the left side. Dr. Wheeler discussed treatment options including consideration of a spinal cord stimulator and use of a personal trainer. Dr. Wheeler prescribed methadone, oxycodone, Flexeril, Celexa, and gabapentin (Tr. 238-39).

On May 24, 2010, the plaintiff was alert and oriented, had grossly intact cranial nerves, deconditioning in her thoracolumbar muscles, and reduced lumbar range of motion (Tr. 237). Dr. Wheeler reevaluated her for continued back pain radiating down her legs and wrap-around pain. She rated her pain at seven out of ten and indicated that she was interested in pursuing a spinal cord stimulator. Dr. Wheeler noted that the plaintiff had a recent flare in pain that she attributed to disruption in her routine due to family issues. Dr. Wheeler refilled the plaintiff's medications and added nortriptyline (Tr. 237).

The plaintiff continued treatment with Dr. Wheeler during the relevant period. She received two injections for pain relief in August and September 2010 (Tr. 234-35). On September 13, 2010, she reported having better sleep but inadequate coverage of her pain during the day with long-acting medications, requiring higher dosages of short and fast acting opioids. She rated her pain at an eight our of ten (Tr. 233).

On October 14, 2010, the plaintiff described ongoing pain that was "tolerable on [her] current treatment plan." She stated that the neurolytic block injections along with the Toradol injection improved her pain, but, due to financial constraints, she was unable to obtain injections on a frequent basis. She rated her pain at a seven out of ten. She

8

stated that "exercising has become a routine component of her daily lifestyle." The plaintiff related improvement with physical therapy, but had not pursued treatment because her physical therapist took an unforeseen absence. The plaintiff was also receiving massage therapy every two weeks. Dr. Wheeler continued the plaintiff's current medical regimen and refilled all of her medications. (Tr. 232).

On December 10, 2010, the plaintiff described that she was "coping well and [was] satisfied with the current treatment plan" though she had difficulty sleeping. She reported her pain at seven out of ten. Dr. Wheeler advised that the plaintiff continue with medication and her exercise program until she could get back into physical therapy (Tr. 230-31).

On February 21, 2011, the plaintiff saw Shervon Stoutamire, PA-C. The plaintiff continued to report pain that was unchanged but tolerable on her current medication regimen (Tr. 245). She preferred to wait for her physical therapist to return from his leave of absence and had not started formal therapy. While the plaintiff reported back pain, she denied muscle weakness. She reported a pain level of eight out of ten. On examination, she walked without assistance (*id*.). She had full range of motion in her neck, tenderness, spasms, and decreased range of motion in her back, full motor strength, and normal gait (*id*.). Ms. Stoutamire found back tenderness, bilateral paraspinal spasms, and decreased range of motion. The plaintiff had left lateral curvature of her spine and deconditioning of her thoracolumbar paraspinal muscles. Ms. Stoutamire diagnosed lumbago, nonallopathic lesions of the cervical region, thoracic or lumbosacral neuritis or radiculitis, and carpal tunnel syndrome. The plaintiff's medications were refilled including carisoprodol, methadone, oxycodone, and gabapentin (Tr. 244-46).

On April 5, 2011, the plaintiff reported to Ms. Stoutamire that "[i]n general, her current medication regimen adequately controls her pain" though she attributed a flare-up to a virus and caring for her ill son (Tr. 248). The plaintiff denied muscle aches or

9

weakness (*id*.).  On examination, she walked without assistance, had full range of motion in her neck and back, and displayed full strength throughout her body (*id*.).  Ms. Stoutamire noted that the plaintiff was very interested in a spinal cord stimulator trial but was unable to have one implanted due to financial reasons.  The plaintiff complained of stiffness and pain in her neck, frequent and severe headaches, and anxiety. Her physical examination showed continued tenderness and spasms.  She received a Toradol injection and was continued on her current medications (Tr. 247-49).

On April 6, 2011, the plaintiff attended a consultative examination with Donald McQueen, III, M.D.  Dr. McQueen reviewed records from Dr. Wheeler and the Rehab Center.  The plaintiff reported that, since 2001, she had back problems, which worsened in 2006 with a work-related injury.  The plaintiff indicated that she had unresolved back pain since that injury.  The plaintiff's medications were noted to include methadone, oxycodone, Soma, and Neurontin, and she indicated that these medications caused her to feel drowsy. The plaintiff did not require a cane, crutch, or other assistive device to walk, and could get onto the examination table without assistance.  She had normal range of motion in her neck, back, shoulders, elbows, wrists, knees, hips, and ankles.  The plaintiff could squat, but could not perform a full squat due to pain.  The plaintiff had a negative straight leg raising test in both the seated and supine positions.  She displayed normal gait, and no muscle weakness, sensory loss, or atrophy.  Based on his examination, Dr. McQueen opined that the "[o]bjective findings do not support an orthopedic impairment or diagnosis that would limit [the plaintiff's] ability to perform work-related functions such as standing, sitting, moving about, lifting, carrying, and handling objects" (Tr. 251-55).

A Psychiatric Review Technique Questionnaire form was completed by Martha Durham, a non-examining doctor on contract to the Administration, on April 22, 2011, indicating that the plaintiff had medically determinable mental impairments causing mild restriction of daily activities, mild difficulty in maintaining social functioning, mild difficulty in

maintaining concentration, persistence, and pace, and no episodes of decompensation (Tr. 259-72).

A Physical Residual Functional Capacity Assessment was completed by Matthew Fox, a non-examining doctor on contract to the Administration, on April 29, 2011. Dr. Fox found the plaintiff capable of lifting and carrying 50 pounds occasionally and 25 pounds frequently, standing/walking about six hours in an eight hour workday, and sitting about six hours in an eight hour workday. Dr. Fox indicated that the plaintiff could occasionally climb ladders, ropes, and scaffolds, and could frequently perform all other postural abilities. The plaintiff needed to avoid even moderate exposure to hazards and needed to avoid concentrated exposure to extreme heat, extreme cold, fumes, odors, dusts, gases, and poor ventilation (Tr. 273-80).

On June 28, 2012, Ms. Stoutamire evaluated the plaintiff, noting that due to limited health coverage, the plaintiff was unable to move forward with a spinal cord stimulator trial at that time. The plaintiff reported neck and mid-back pain, but no muscle weakness. Ms. Stoutamire noted tenderness in the plaintiff's neck with decreased range of motion, spasms in her lower back, slightly reduced 4+/5 strength in her left shoulder, and full strength throughout the rest of her body. The plaintiff reported increased cervical and upper thoracic pain worsened by activities such as lifting and holding her son and overhead reaching. The plaintiff indicated that she occasionally had pain that radiated from her shoulder down into the center of her back and in between her shoulder blades. The plaintiff reported numbness in her left thumb, and first and second digits, which seemed worse at night. Ms. Stoutamire indicated that the plaintiff's wrap-around pain was stable on her current medications. The plaintiff had been attending regular massage therapy for trigger points which gave her some improvement. She rated her pain at seven-eight out of ten. Ms. Stoutamire noted that the plaintiff had tenderness and decreased range of motion in her cervical spine, cervical-myofascial dysfunction with trigger points palpated, and bilateral

11

paraspinal spasms. Ms. Stoutamire gave the plaintiff a left intra-articular shoulder steroid injection and refilled her medications (Tr. 283-85). An MRI showed a mild disc bulge in the plaintiff's neck with no evidence of cord compression (Tr. 344).

The plaintiff continued treatment with Dr. Wheeler during the relevant period. She related that she cared for her young child, and progress notes did not document significant findings or include any functional restrictions (Tr. 330-40). On July 12, 2011, Dr. Wheeler evaluated the plaintiff for chronic cervical-trapezius myofascial pain and chronic left shoulder impingement, which had gradually worsened over time. He gave the plaintiff shoulder injections (Tr. 346).

A Psychiatric Review Technique Questionnaire form was completed by Xanthia Harkness, a non-examining doctor on contract to the Administration, on July 14, 2011, indicating that the plaintiff had medically determinable mental impairments causing mild restriction of daily activities, mild difficulty in maintaining social functioning, mild difficulty in maintaining concentration, persistence, and pace, and no episodes of decompensation (Tr. 306-19).

A Physical Residual Functional Capacity Assessment was completed by Dale Van Slooten, a non-examining doctor on contract to the Administration, on July 14, 2011. He found the plaintiff capable of lifting and carrying 50 pounds occasionally and 25 pounds frequently, standing/walking about six hours in an eight hour workday, and sitting about six hours in an eight hour workday. Dr. Van Slooten indicated that the plaintiff could occasionally climb ladders, ropes, and scaffolds; and, could frequently perform all other postural abilities. The plaintiff needed to avoid even moderate exposure to hazards and needed to avoid concentrated exposure to extreme heat, extreme cold, fumes, odors, dusts, gases, and poor ventilation (Tr. 320-27).

On September 20, 2011, Dr. Wheeler evaluated the plaintiff and reviewed her MRI results. The plaintiff requested that she be restarted on Lyrica, which had helped in

the past but was stopped because it was not covered by insurance at that time. Dr. Wheeler recommended physical therapy but noted that the plaintiff could not afford to obtain that treatment at that time. Dr. Wheeler refilled the plaintiff's other medications (Tr. 340-42). On December 19, 2011, the plaintiff rated her pain at seven out of ten. She reported flare-ups related to bending or lifting episodes with her child. Dr. Wheeler refilled the plaintiff's medication and continued the plaintiff on a home exercise program (Tr. 339).

On March 15, 2012, Dr. Wheeler evaluated the plaintiff for continued wrap-around pain. He noted that the plaintiff had a recent episode of paroxysmal atrial tachycardia and had been placed on Topamax by a cardiologist. The plaintiff's cardiologist recommended that the plaintiff be switched off of methadone. Dr. Wheeler recommended switching from methadone to a fentanyl patch and switching from Cymbalta to Effexor. Dr. Wheeler noted that the plaintiff's urine drug screen was consistent with her prescribed treatment (Tr. 338). On May 10, 2012, the plaintiff reported having a difficult time controlling her pain. She remained compliant with her home exercise program and noted that activities such as caring for her son and home aggravate her pain symptoms. Dr. Wheeler indicated that the plaintiff's physical examination remained unchanged and stable. He refilled the plaintiff's medications (Tr. 332-34).

On July 31, 2012, Tina Kujawaski, Dr. Wheeler's nurse practitioner, evaluated the plaintiff. The plaintiff reported increased pain with activities such as holding her son and reaching overhead. However, she described her mid-back wrap around pain as stable, and related improvement from massage therapy. She had low back spasms and neck tenderness, but full strength throughout her body. Ms. Kujawaski refilled the plaintiff's medications and increased the plaintiff's oxycodone for breakthrough pain (Tr. 328-30).

Following the ALJ's decision on March 14, 2013, the plaintiff submitted the evidence summarized below to the Appeals Council. The Appeals Council made the

evidence a part of the record but denied the plaintiff's request for review (Tr. 8, 11; *see* Tr. 385-403)).

1) On April 19, 2013, Dr. Wheeler provided a statement explaining that the plaintiff had chronic left flank and mid-back pain that radiates into her lower and upper abdomen. He noted that her pain was originally thought to be related to endometriosis, but over time her pain became more mechanical, and, when it was severe, it radiated into her left hip, lateral thigh, lateral shin, and ankle. Dr. Wheeler indicated that the plaintiff's pain became more constant and severe over time. Dr. Wheeler stated that the plaintiff's initial studies showed a paracentral disc protrusion at T7-8 on the right abutting the cord, and she had degenerative changes in her lower lumbar region. Dr. Wheeler noted that he first evaluated the plaintiff in January 2003 and that her pain became more severe over the next year with sciatica and positive straight leg raising at 40 degrees. Dr. Wheeler explained that the plaintiff was placed on multiple medications for neuropathic pain and was referred to physical therapy and Pilates. Dr. Wheeler stated, "She was compliant with all recommended treatments." Dr. Wheeler indicated that the plaintiff improved initially, but returned after being injured at work. He indicated that over time, the plaintiff's pain had moved into the thoracic region and had even involved her cervical and shoulder regions. Dr. Wheeler stated, "The patient describes on-going constant aching pain that radiates around the groin, now on both sides. Thoracic pain is described as severe, burning and radiating from the mid back. This wraps under the rib cage and into the abdomen." Dr. Wheeler explained that the plaintiff also sometimes had sharp, stabbing pains and that the plaintiff reported chronic pain between her shoulder blades radiating into the left shoulder. The plaintiff's shoulder pain sometimes involved her neck, and the plaintiff described it as having a burning quality. The plaintiff described severe left hip pain that wraps from the buttock into the hip, down the posterolateral thigh, across the knee, over the left lateral shin, and on to the left side of her ankle. Dr. Wheeler stated that over time, the plaintiff had

14

fluctuating and sometimes severe muscle spasms in the affected areas.  He indicated that the plaintiff had chronic soft tissue changes with increased muscle tone and trigger points in the left lumbar region.  The plaintiff's soft tissue changes encompassed the entire lumbar region and radiated into her abdomen where she was sometimes tender to palpation.  Dr. Wheeler noted that the plaintiff had similar soft tissue dysfunction in the thoracic region, which often involved the left trapezius muscle.  Dr. Wheeler stated that the plaintiff had no frank weakness, but did have positive straight leg raising between 40 to 60 degrees with an empty end-feel.  He noted that the plaintiff had limited lumbar flexion and had pain when elevating, especially abducting, her left arm at the shoulder.  Dr. Wheeler stated that the plaintiff's motor strength (other than limitation due to pain) and reflexes were symmetrical. Dr. Wheeler stated that diagnostic testing done in 2006 and 2007 showed a paracentral disc herniation at T7-T8, which mildly effaced the spinal cord; bulging discs at C5-6, C6-7, and T5-6; degenerative arthropathy of the facets at L4-5; mild canal stenosis at C5-6 and T7-8.   Dr. Wheeler indicated that his diagnoses were chronic thoracic and lumbar segmental and soft tissue dysfunction with sciatica in a distribution that most closely resembles an L5-radiculopathy and chronic changes in the upper torso, especially affecting the left shoulder with fluctuating tendonitis and bursitis of the rotator cuff.  Dr. Wheeler noted that the plaintiff had responded to aggressive physical therapy and a home exercise program.  He confirmed that the plaintiff had undergone procedures including facet blocks, selective nerve root blocks, and trigger point injections, which had only provided temporary relief at times.   Dr. Wheeler stated, "It is my belief that this patient requires full time rehabilitation with the guidance of a physical therapist and/or a Pilates instructor.  She requires access to a swimming pool for water therapy.  However, I do not see her returning to a full time sedentary job for the foreseeable future" (Tr. 386-88).

2) On April 29, 2013, Dr. Wheeler completed a Residual Functional Capacity Form regarding the plaintiff (Tr. 389-94).  He stated that he treated the plaintiff every two

15

to three months to adjust medications, give injections, and reevaluate her symptoms. Dr. Wheeler indicated that he would expect the plaintiff's disability and impairments to last one year or more. He opined that the plaintiff's impairments would prevent her from standing for six to eight hours, estimating that the plaintiff could stand for about 30 minutes. Dr. Wheeler indicated that the plaintiff's impairments affected her sitting, estimating that she could sit and stand for 30 minutes. He explained that the plaintiff's pain was gravity-sensitive and prevents prolonged sitting and standing. He indicated that the plaintiff's impairments would require her to lie down during the day explaining that her pain increases when she is vertical. Dr. Wheeler estimated that the plaintiff could walk non-stop about 100 yards. He indicated that the plaintiff could rarely reach above her shoulders or reach down towards the floor; could frequently reach down to waist level; and could consistently carefully handle objects and handle with fingers. Dr. Wheeler indicated that the plaintiff could lift and carry less than five pounds. He explained that the plaintiff was only able to carry her child on her hip, below her lumbar spine, but her standing and walking capacity remained the same. He indicated that the plaintiff's bending ability was reduced by 50%. He indicated that the plaintiff was unable to perform squatting or kneeling unless necessary. The plaintiff's ability in turning her upper body at her waist was reduced by 50%, and her neck rotation was reduced by 30-40%. Dr. Wheeler stated that the plaintiff's impairment prevented her from traveling alone, explaining that the plaintiff had pain with prolonged sitting. He indicated that the plaintiff needed to recline three to four times per day for 30 minutes at a time. He stated that the plaintiff's pain was constant, but fluctuated in severity. He noted that the plaintiff's pain was seven to nine out of ten. Regarding the plaintiff's credibility, Dr. Wheeler stated, "I have known her for greater than 11 years. I have seen her improve and return to school/work and I have seen recent downhill course." He explained that the objective reason for the plaintiff's pain was spinal segmental instability with diffuse soft tissue dysfunction. He stated that he did not believe that the plaintiff could

16

resume work and that she would be unable to fulfill her duty requirements. He indicated that the plaintiff's impairments might allow her to do part-time sedentary work from home.  Dr. Wheeler stated that the plaintiff's disability was not likely to change over the foreseeable future but that maybe in five to ten years she might be able to return to some type of work (Tr. 389-94).

***Administrative Hearing Testimony***

The plaintiff testified that she was injured in 2006 when she was helping a veterinarian resuscitate an animal (Tr. 33-34).  The plaintiff testified that she had a lot of pain prior to that incident but this injury really exacerbated her pain.  She had tried physical therapy, different types of block injections, massage therapy, and chiropractic treatment. She explained that she was not a surgical candidate because she also has scoliosis (Tr. 34).  The plaintiff testified that she takes methadone, oxycodone, gabapentin, and Soma and that these medications cause drowsiness and fatigue (Tr. 34-35).  She testified that she has neck pain that radiates down her right shoulder, thoracic pain that radiates around to her abdomen, and lumbar pain that radiates down her left hip to her ankle (Tr. 35).  She explained that her thoracic and lumbar pains are constant, but the severity of those pains waxes and wanes, and her cervical pain and hip pain come and go (Tr. 35).

The plaintiff testified that on her typical day she tries to do her best to take care of her son.  She explained that she has a lot of help from her family and her husband and that on most days her mother-in-law or her father comes over to help her so she can lay down (Tr 36).  The amount of time varies but "some days it's the whole day."  The plaintiff testified that she can cook quick things that don't require her to stand long or bend (Tr. 37).  She explained that her husband does most of the housework, and she tries to help him out, giving the example of her husband putting laundry in an out of the washer, carrying it, and her helping him fold it (Tr. 37-38).

17

The plaintiff testified that the heaviest she could lift was about five pounds (Tr. 38). She estimated that she could stand for about 25 to 30 minutes, could walk for about ten to fifteen minutes before she would need a break, and could sit for about 25 minutes (Tr.39). The plaintiff testified that her right eye blindness causes her to have to turn her head to the right a lot, which increases her thoracic pain (Tr. 40). This problem, along with her medications, makes it difficult for her to drive (Tr. 41).

***Vocational Expert***

After identifying the plaintiff's past relevant work, (Tr. 42), the ALJ asked the vocational expert the following hypothetical:

> Now, if I have a person who is the same age as the claimant, same education, same vocational profile, and with the light exertional level, with a sit/stand option, no overhead reaching or squatting, no hazardous machinery, and no - - all right. Would a person with these limitations be able to do any of the claimant's past relevant work?

(Tr. 42-43). The vocational expert indicated that this hypothetical would preclude the plaintiff's past relevant work, but would allow for other work such as a non-governmental mail sorter, an airline customer service clerk, or a telephone information clerk (Tr. 43-44). The ALJ then asked about the addition of being off task about 15% of the day due to medication side effects. The vocational expert responded that the offered jobs would still be available (Tr. 44).

The ALJ's next hypothetical was:

> You take a person who is the same age as the claimant, same education, same vocational profile, put them at the sedentary exertional level, with a sit/stand option, no overhead reaching, no squatting, no hazardous machinery, and would be off task about 15 percent of the workday, would a person with these limitations be able to do any of the claimant's past relevant work?

(Tr. 44). The vocational expert testified that there would be transferable skills to the job of a medical office receptionist at the sedentary level (Tr. 44-45). The vocational expert also

indicated that this hypothetical would allow for other work such as a telephone order clerk, a telephone quotation clerk, and an addresser. The plaintiff's attorney asked the vocational expert about the restriction of needing four to five unscheduled breaks of 20 minutes each during an eight-hour period. The vocational expert responded that there would be no jobs, explaining "the person would then start to lose too much productivity and would not keep the job" (Tr. 45).

## ANALYSIS

The plaintiff argues that (1) Dr. Wheeler's opinion, which was new evidence submitted to the Appeals Council, requires remand; and (2) the ALJ failed to provide adequate reasons for the credibility determination.

The plaintiff first argues that the new evidence submitted to the Appeals Council might have affected the Commissioner's decision. As discussed above, the Appeals Council considered the April 2013 opinions of the plaintiff's treating pain specialist, Dr. Wheeler, and admitted the opinions into the record (Tr. 8-11). However, the Appeals Council summarily stated that it "found that this information does not provide a basis for changing the Administrative Law Judge's decision" (Tr. 9).

The law provides that evidence submitted to the Appeals Council with the request for review must be considered in deciding whether to grant review " 'if the additional evidence is (a) new, (b) material, and (c) relates to the period on or before the date of the ALJ's decision.' " *Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 953 F.2d 93, 95–96 (4th Cir.1991) (en banc ) (quoting *Williams v. Sullivan*, 905 F.2d 214, 216 (8th Cir.1990)). Evidence is new "if it is not duplicative or cumulative." *Id*. at 96. "Evidence is material if there is a reasonable possibility that the new evidence would have changed the outcome." *Id.* When a claimant seeks to present new evidence to the Appeals Council, she is not required to show good cause for failing to present the evidence earlier. *Id*. at 96 n. 3; cf. 20 C.F.R. § 404.970(b) . Furthermore, the United States Court of Appeals for the Fourth Circuit has

19

explicitly held that "[t]he Appeals Council need not explain its reasoning when denying review of an ALJ decision." *Meyer v. Astrue*, 662 F.3d 700, 702 (4th Cir.2011). The court stated that when the Appeals Council receives additional evidence and denies review, the issue for the court is whether the ALJ's decision is supported by substantial evidence and reached through the application of the correct legal standard. *Id*. at 704. "In making this determination, we 'review the record as a whole' including any new evidence that the Appeals Council 'specifically incorporated ... into the administrative record.'" *Id.* (quoting *Wilkins*, 953 F.2d at 96).

The Commissioner argues that the evidence at issue is not "new" or "material" (def. brief at 9-11). However, as noted by the plaintiff, the Commissioner supports the argument by citing case law regarding remand pursuant to sentence six of § 405(g), rather than sentence four. *Compare Wilkins*, 953 F.2d at 96 (explaining that evidence submitted to the Appeals Council is "new" "if it is not duplicative or cumulative") *with Melkonyan v. Sullivan*, 501 U.S. 89, 98 (1991) (stating that pursuant to the sixth sentence of § 405(g), "[t]he district court does not affirm, modify, or reverse the Secretary's decision; it does not rule in any way as to the correctness of the administrative determination. Rather, the court remands because new evidence has come to light that was not available to the claimant at the time of the administrative proceeding and that evidence might have changed the outcome of the prior proceeding.") and *Sullivan v. Finkelstein*, 496 U.S. 617 (1990) (explaining that as opposed to the fourth sentence of § 405(g), "[t]he sixth sentence of § 405(g) plainly describes an entirely different kind of remand, appropriate when the district court learns of evidence not in existence or available to the claimant at the time of the administrative proceeding that might have changed the outcome of that proceeding"). The Appeals Council here accepted and made the additional evidence part of the record, rather than returning it, and considered the additional evidence as part of its review (Tr. 8-11) *See Meyer*, 662 F.3d at 704-05 (stating that when new evidence is

20

submitted, "the Appeals Council first determines if the submission constitutes 'new and material evidence' that 'relates to the period on or before the date of the [ALJ's] hearing decision.'"); 20 C.F.R. § 404.970(b) ("If new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision. The Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the period on or before the date of the administrative law judge hearing decision. It will then review the case if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record."); *id.* § 404.976(b)(1) ("The Appeals Council will consider all the evidence in the administrative law judge hearing record as well as any new and material evidence submitted to it which relates to the period on or before the date of the administrative law judge hearing decision. If you submit evidence which does not relate to the period on or before the date of the administrative law judge hearing decision, the Appeals Council will return the additional evidence to you with an explanation as to why it did not accept the additional evidence and will advise you of your right to file a new application.").

The plaintiff relies on *Meyer*, arguing that Dr. Wheeler's April 2013 opinions require remand (pl. brief at 15-20). The ALJ in *Meyer* issued a decision denying benefits and noted that Meyer failed to provide an opinion from his treating physician. 662 F.3d at 702. When Meyer requested review of his claim by the Appeals Council, he submitted a letter from a physician that detailed Meyer's injuries (from a fall) and significant physical restrictions. The Appeals Council summarily denied review but made the letter part of the administrative record. The Magistrate Judge in *Meyer* recommended that the Commissioner's decision be affirmed because the doctor who authored the report was not a treating physician, and thus the report should be accorded only minimal weight, and the district court adopted the Report and Recommendation. *Id.* at 704. The Court of Appeals,

21

however, determined that the doctor was in fact a treating physician, the report submitted to the Appeals Council was the only report in the record from a treating physician, and the report filled an "evidentiary gap" emphasized by the ALJ. *Id*. at 707. The court remanded for additional fact finding to reconcile conflicts between the newly submitted evidence and the evidence the ALJ had considered, noting that the treating physician's opinion corroborated the opinion of an evaluating physician, which had been rejected by the ALJ, but other record evidence credited by the ALJ conflicted with the new evidence. *Id.* The court concluded: "Thus, no fact finder has made any findings as to the treating physician's opinion or attempted to reconcile that evidence with the conflicting and supporting evidence in the record. Assessing the probative value of competing evidence is quintessentially the role of the fact finder. We cannot undertake it in the first instance." *Id.*

Here, in light of the new evidence submitted to the Appeals Council, the undersigned cannot determine whether the decision is supported by substantial evidence. *See Meyer*, 662 F.3d at 707. The ALJ had no treating physician's opinion in the record before him. In the evidence submitted to the Appeals Council, however, Dr. Wheeler cited diagnostic testing supporting his opinion of the plaintiff's physical limitations, including that the plaintiff could lift and carry less than five pounds on a regular basis and could sit and stand for only about 30 minutes. The ALJ found that the plaintiff had the residual functional capacity to perform a limited range of sedentary work (Tr. 20).[4] In doing so, he gave "some weight" to the opinion of consultative examiner Dr. McQueen,[5] who opined that the plaintiff

---

[4]In the ALJ's analysis of the plaintiff's residual functional capacity, he stated, "[B]ased on her history of chronic back pain, her MRIs, her examinations and her recent neck pain, I find the claimant limited to the light exertional level. Due to pain radiating down her legs, I find she must alternate sitting and standing. As she developed shoulder pain and she had difficulties squatting at her consultative examination, I find she cannot reach overhead or squat." (Tr. 21-22). However, in Finding Five, the ALJ limited the plaintiff to sedentary work with the same additional exertional limitations (Tr. 20).

[5]The ALJ mistakenly referred to Dr. McQueen as Dr. Thorpe (Tr. 22).

had no limitations (Tr. 22; *see* Tr. 251-55) and "little weight" to the state examiners' opinions, who opined that the plaintiff could perform medium work (Tr. 22; *see* Tr. 273-80, 320-27).  The opinions of these physicians conflict with that of Dr. Wheeler. Further, the ALJ specifically discredited the plaintiff's subjective allegation that she could only lift up to five pounds (*see* Tr. 20) based on Dr. McQueen's evaluation and the fact that she could carry her child (Tr. 22); however, Dr. Wheeler's opinion supports the plaintiff's subjective report.  Given the foregoing, the undersigned finds that the ALJ's opinion of the plaintiff's credibility and ultimate residual functional capacity assessment may be impacted by the additional evidence submitted to the Appeals Council.   As "no fact finder has made any findings as to the treating physician's opinion or attempted to reconcile that evidence with the conflicting and supporting evidence in the record," *Meyer*, 662 F.3d at 707, this case should be remanded for further consideration.

In light of the court's recommendation that this matter be remanded for further consideration, the court need not address the plaintiff's remaining allegations of error, as they may be rendered moot on remand. *See Boone v. Barnhart*, 353 F.3d 203, 211 n.19 (3d Cir.2003) (remanding on other grounds and declining to address claimant's additional arguments).  However, if needed, the ALJ should also address the issues presented in the plaintiff's allegation that the ALJ failed to properly assess her credibility.

## CONCLUSION AND RECOMMENDATION

Now, therefore, based on the foregoing, it is recommended that the Commissioner's decision be reversed pursuant to sentence four of 42 U.S.C. § 405(g) and that the case be remanded to the Commissioner for further consideration as discussed above.

s/ Kevin F. McDonald
United States Magistrate Judge

November 17, 2015
Greenville, South Carolina

23